UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ANGIE BOUCHARD,                                      :
                                                     :          04 Civ. 9978 (CSH)
                        Plaintiff,                   :
                                                     :          MEMORANDUM OPINION
        -against-                                    :          AND ORDER
                                                     :
NEW YORK ARCHDIOCESE,                                :
CARDINAL JOHN EGAN, CHURCH OF                        :
OUR SAVIOR, FR. KENNEDY, FR.                         :
"JOHN DOE", and "JOHN DOE"                           :
RELIGIOUS ORDER,                                     :
                                                     :
                        Defendants.                  :
-------------------------------------------------------X

HAIGHT, Senior United States District Judge:

        Plaintiff Angie Bouchard has sued Defendants for alleged misconduct relating to certain

sexual transgressions she claims she suffered at the hands of Defendant Father Fernando Kennedy,

a Catholic priest.  The action was commenced by the filing of a summons and notice in New York

State court on August 31, 2004, and was subsequently removed to this Court on the ground of

diversity of citizenship.

        Currently pending before the Court are two motions by Defendants.  First, the Archdiocese

of New York s/h/a New York Archdiocese, Edward Cardinal Egan s/h/a Cardinal John Egan, and

the Church of Our Savior (collectively, "the Church Defendants")[1] move for summary judgment in

their favor on the ground that the Plaintiff's two surviving claims are time-barred by the applicable

statutes of limitations.  Second, a motion is made on behalf of Cardinal Egan alone for

_____

        [1]  The phrase "Church Defendants" is intended to distinguish those parties from the
individual defendant, Fr. Kennedy.

1

reconsideration or reargument of that portion of the Court's prior opinion, reported at 2006 WL 1375232 (S.D.N.Y. May 18, 2006) ("*Bouchard I*"), denying Cardinal Egan's motions to dismiss and/or for summary judgment.

For the reasons that follow, the Church Defendants' motion asserting time bar is granted in part and denied in part.  Cardinal Egan's motion is granted and summary judgment will be entered dismissing the complaint against him.

## I.  BACKGROUND

The relevant factual background of this action is set forth in detail in *Bouchard I*, familiarity with which is assumed.  For present purposes, it is sufficient to state that Plaintiff alleged in her Amended Complaint that Fr. Kennedy sexually abused her while he was employed at the Church of Our Savior, a parish within the New York Archdiocese, and that the Church Defendants were liable for Kennedy's improper acts, based upon a number of legal theories.

*Bouchard I* decided motions made by the Church Defendants to dismiss the Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative for summary judgment under Fed. R. Civ. P. 56.  Specifically, *Bouchard I* dismissed Plaintiff's claim against the Church Defendants for the intentional tort of battery, *see* 2006 WL 1375232, at *4; declined to dismiss her claim against those Defendants for their negligent hiring, supervision, or retention of Fr. Kennedy, *id*. at *4-5; dismissed her claim against those Defendants for negligent infliction of emotional distress but declined to do so with respect to her claim for intentional infliction of emotional distress, *id*. at *5-6; dismissed her claim against those Defendants for breach of a fiduciary duty, *id*. at *6-7; and denied the Church Defendants' motion for summary judgment on Plaintiff's claim for negligent hiring, supervision, or retention, *id*. at *7-9.  These decisions were made on the basis of the record then before the Court.

2

As will appear in the Discussion in Part II, that record has been expanded by subsequent submissions.

## II. DISCUSSION

**A.    The Motion for Summary Judgment Based on the Statutes of Limitations**

The Church Defendants have moved for summary judgment in their favor pursuant to Fed. R. Civ. P. 56 on the ground that Plaintiff's claims are time-barred by the applicable statutes of limitations.[2]

### 1.    Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact; this burden is satisfied if the moving party can point to the absence of evidence necessary to support an essential element of the non-moving party's claim.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  If "as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party," then summary judgment should not be granted.  *Chambers*

---

[2] The Church Defendants also took issue with Plaintiff's counsel's late filing of his statement of uncontested facts pursuant to Local Civil Rule 56.1, as well as his complete failure to file a memorandum of law in opposition to the motion pursuant to Local Civil Rule 7.1.  In a previous order, however, I stated that I would accept the late submission of Plaintiff's Rule 56.1 statement, and would not require Plaintiff's counsel to make an additional submission of authorities if he chose not to.  *See* Order of the Court, dated Aug. 15, 2006.

*v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  The substantive law will identify which facts are material.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

An adverse party resisting summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

      2.      **Propriety of Summary Judgment**

          a.      **Negligent Hiring/Supervision Claim**

The applicable statute of limitations for a negligent hiring or supervision claim is three years. N.Y. C.P.L.R. § 214(5).  *See, e.g., Green v. Emmanuel African Methodist Episcopal Church*, 718 N.Y.S.2d 324 (App. Div. 1st Dep't 2000).  The statute of limitations begins to run from the date of the commission of the act or injury complained of.  *See Marino v. Proch*, 258 A.D.2d 628 (N.Y. App. Div. 2d Dep't 1999).

The Church Defendants argue that the allegations made against Fr. Kennedy in the Amended Complaint relate to misconduct purportedly occurring in July and August of 2001.  Therefore, according to the Church Defendants, since Plaintiff did not file her action until August 31, 2004, Plaintiff's claims are barred by the three-year statute of limitations.

However, Plaintiff contests the Church Defendants' contention that alleged sexual misconduct did not occur after August 30, 2001.  Plaintiff has submitted a sworn affidavit stating that she "had involvement with and was molested by Fr. Fernando Kennedy in July, August *and*

*September* 2001." Affidavit of Plaintiff Angie Bouchard, dated July 5, 2006, ¶ 2 (emphasis added). She further asserts that "the last of my face to face meetings and physically abusive experiences with Fr. Kennedy occurred from September 3 to September 7, 2001, and Fr. Kennedy was still working at and in the Church of Our Savior during this time." *Id.*, ¶ 4.

Moreover, Plaintiff has controverted the assertion in the Church Defendants' statement of uncontested facts that "[t]he alleged incidents of sex abuse . . . occurred during July and August 2001," as averred in the Church Defendants' Statement Pursuant to Local Civil Rule 56.1, dated June 7, 2006, ¶ 2. Plaintiff's statement of uncontested facts asserts that "[t]he plaintiff was molested and sexually abused by Fr. Kennedy in September, 2001, and specifically during the time period from September 3, 2001 to September 7, 2001." Plaintiff's Rule 56.1 Statement of Uncontested Facts, dated August 2 & 3, 2006, ¶ 2.

Based on the foregoing, I conclude that the Church Defendants have failed to meet their burden of showing the absence of any genuine issue of material fact regarding the statute of limitations issue. Plaintiff's sworn statements allege sexual misconduct into September 2001, which is less than three years prior to August 31, 2004, the date upon which the complaint was originally filed. The Church Defendants' first item of evidence in support of their motion, the affidavit of Monsignor Desmond O'Connor,[3] wherein he states that Ms. Bouchard previously told him she was sexually abused during July and August 2001, is sufficiently countered by the sworn statements of Plaintiff. Further, the Church Defendants' proffer of copies of checks issued by the Church of Our Savior to Fr. Kennedy (dated August 13, 14, and 30) as evidence that the alleged sexual misconduct

---

[3] Monsignor O'Connor is the Director of the Office of Priest Personnel of the Archdiocese of New York.

occurred prior to August 31, 2001 is insufficient to foreclose the possibility that misconduct did in fact occur on or after that date.  Genuine fact questions remain on this issue.

As a result, the Church Defendants' motion for summary judgment in their favor on statute of limitations grounds with regard to Plaintiff's negligence claim is denied, without prejudice to renew if further discovery reveals that all the misconduct Plaintiff alleges occurred prior to August 31, 2001.[4]

### b.    Intentional Infliction of Emotional Distress Claim

Claims for intentional infliction of emotional distress are governed by the one-year statute of limitations for intentional torts specified in N.Y. C.P.L.R. § 215(3).  *See, e.g., Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F. Supp. 450, 455 (S.D.N.Y. 1997) ("It is well established under New York law that a claim for intentional infliction of emotional distress has a one-year statute of limitations.") (citations omitted).  When applying the statute of limitations to a claim of intentional infliction of emotional distress, "all acts occurring before the limitations period are excluded from consideration."  *Santan-Morris v. N.Y. Univ. Med. Ctr.*, No. 96 Civ. 621, 1996 WL 709577, at *2 (S.D.N.Y. Dec. 10, 1996) (citations omitted).

Therefore, in the case at bar, since the action was commenced on August 31, 2004, a claim arising out of any allegedly intentional misconduct occurring prior to August 31, 2003 would be

---

[4]  I note in this regard that counsel for the Church Defendants commenced the deposition of Bouchard on September 8, 2006.  The deposition was terminated before completion as the result of a dispute between counsel on an issue unrelated to the present motion.  That termination has generated motion practice before Magistrate Judge Pitman, who is supervising discovery.  The Church Defendants' motion for summary judgment based upon the statute of limitations may be renewed if evidence from a renewed deposition of Plaintiff or from some other admissible evidence demonstrates that, notwithstanding Bouchard's prior assertions to the contrary, all of Fr. Kennedy's wrongful conduct unquestionably occurred prior to August 31, 2001.

time-barred.  As discussed in *Bouchard I*, 2006 WL 1375232, at *5-6, to the extent Plaintiff is asserting a claim for intentional infliction of emotional distress against the Church Defendants, that claim appears to be based on some sort of scheme of concealment of Fr. Kennedy's alleged wrongdoings, or a failure to warn those in Plaintiff's position of Fr. Kennedy's alleged propensities for sexual abuse.  It seems, however, that any conduct giving rise to such a claim would have occurred well before August 31, 2003, and in all likelihood prior to or contemporaneously with the alleged misconduct which purportedly occurred during the summer of 2001.  Moreover, Plaintiff's affidavit submitted in response to the Church Defendants' motions does not make any claims that any alleged conduct intended by the Church Defendants to inflict emotional distress upon Plaintiff occurred after August 31, 2003 (in fact, the affidavit does not appear to contain any assertions related to an intentional infliction of emotional distress claim at all).

As a result, I conclude that any intentional infliction of emotional distress claim asserted by Plaintiff is time-barred.  Accordingly, I grant the Church Defendants' motion for summary judgment on this claim.

**B.**     **Cardinal Egan's Motion for Reconsideration or Reargument**

As previously noted, the Defendant Cardinal Egan moves for  reconsideration or reargument of that portion of *Bouchard I* that denied his motions to dismiss Plaintiff's claims against him or for summary judgment.

**1.**     **Standard of Review**

 Motions for reconsideration or reargument are governed by Local Civil Rule 6.3, which requires the moving party to identify "the matters or controlling decisions which counsel believes the court has overlooked."  As the wording of the Rule suggests, such motions are ordinarily made

on the basis of the record existing at the time when the Court issued the challenged decision.  Thus it has been held that the successful movant for reconsideration "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Koehler v. Bank of Bermuda Ltd.*, No. M18-302, 2005 WL 1924746, at *1 (S.D.N.Y. Aug. 10, 2005) (citation omitted).  However, *au fond* the Court's proper function on a motion for reconsideration is to determine whether "controlling decisions or data" are shown which "might reasonably be expected to alter the conclusion reached by the court."  *Valentine v. Metro. Life Ins. Co.*, No. 85 Civ. 3006, 2005 WL 1278524 (S.D.N.Y. Aug 10, 2005), at *2 (citation omitted).  In the case at bar, both Defendant Egan and Plaintiff Bouchard have filed submissions subsequent to the issuance of *Bouchard I.*  Those additional submissions contain admissible evidence which is relevant to the question presented, namely, whether Bouchard has a viable claim that Egan is liable to her for any harm inflicted upon her by Fr. Kennedy.  I will consider the substance of those submissions in deciding the present motion, and describe them in turn.

### 2.     Additional Submission by Defendant Egan

Cardinal Egan submits an affidavit to which he swore on August 24, 2006.[5]  He begins his affidavit by summarizing the boundaries and demographics of the New York Archdiocese, of which he is the spiritual leader and chief administrative officer: ten counties, 405 parishes, 1,536 priests, 3,028 nuns, 209 diocesan and parish elementary schools, 23 diocesan and parish high schools, 5,400 lay teachers, and more than 2.5 million confirmed Roman Catholics.  Affidavit, ¶¶ 2, 3.[6]  Egan then

---

[5]  Unaccountably, the Church Defendants' original motion papers did not include an affidavit by Egan.

[6]  These figures are taken from the Archdiocese's most recent statistics, compiled in late 2005.  *Id.*, ¶ 2.

turns to the factors central to Bouchard's effort to hold him personally liable for the conduct within the Archdiocese's boundaries of a priest visiting from a foreign diocese, such as Fr. Kennedy. On that score, it is useful to quote the pertinent paragraphs of Egan's affidavit in their entirety:

> 4.  When priests from other dioceses and from religious orders visit parishes within the Archdiocese, there is virtually never a reason for them to be brought to my attention. I never meet or speak with the vast majority of priests who visit parishes within the Archdiocese.
>
> 5.  I am aware that Angie Bouchard has filed a lawsuit alleging improper conduct by one Father Kennedy, who is alleged to have visited a parish within the Archdiocese from Sri Lanka some time in 2001. I can categorically state that I have never met, sanctioned or authorized Father Kennedy, nor did I have anything to do with his alleged presence or purported service in the parish. Until Ms. Bouchard complained to the Archdiocese in 2004, I had never even heard of Father Kennedy. Finally, I do not know Ms. Bouchard, and am only aware of her because of the allegations she has made.
>
> 6.  I have absolutely no personal knowledge of, and had no personal involvement in, the acts alleged in the Plaintiff's lawsuit.

### 3.  Additional Submissions by Plaintiff

With a letter to the Court dated September 25, 2006, counsel for Plaintiff encloses a number of documents recently produced by the Church Defendants in discovery and applies to have them made a part of the record on these motions. I grant that application and consider the contents of the documents.

These documents comprise six pages. The first five were apparently generated by the Archdiocese's Office of Priest Personnel. They refer to the complaint which Plaintiff lodged with the Archdiocese, initially through her lay counselor, about Fr. Kennedy's conduct. The sixth page appears to be a page from a newsletter issued by the Church of Our Savior. The Office of Priest Personnel is headed by Monsignor Desmond O'Connor, whose affidavit verified on November 29,

2005 was referred to in *Bouchard I*, 2006 WL 1375232, at *2. Page 2 of this latest submission is

a memorandum dated June 14, 2004 Monsignor O'Connor dictated to the files, describing a meeting

held on that date between himself, a "Sister Eileen" (not further identified), and Bouchard.

O'Connor's memorandum contains this discussion, pertinent to the role of Cardinal Egan *vis-a-vis*

Fr. Kennedy:

> After the initial conversation to get acquainted, we discussed Father
> Kennedy. I told her we where [*sic*] not able to provide details about
> him because we did not have a file on him. He was summer help at
> Our Savior during the summer of 2001. This was just after the pastor,
> Father Jeremiah O'Neill, passed away. There was no pastor at the
> parish at the time. Fr. Hennessy was appointed administrator, but was
> not present because of cancer treatments. Fr. Fernando Kennedy
> apparently came for summer help without going through the
> Chancery. I explained to her that all priests had universal faculties to
> celebrate Mass and hear Confessions, so it was not unusual in the past
> for pastors to have a priest help out without getting all the paperwork.
> I also assured her that this was no longer the case, and that now the
> Dallas Charter required all priests to have a Good Standing Form
> before receiving faculties. Now all priests who helped out here had
> to receive Archdiocesan faculties.[7]

The "Dallas Charter" mentioned in O'Connor's memorandum is undoubtedly the Charter for the

Protection of Young People approved and promulgated on June 14, 2002 by a conference of

American Catholic bishops convened in Dallas to address the problem of sexual misconduct by

priests. The norms and procedures set forth in the Dallas Charter required Vatican approval and

contemplated implementation at the archdiocesan and diocesan levels. Under Fed. R. Evid. 201 I

---

[7] The noun "faculties" in this context is defined in Monsignor O'Connor's affidavit dated
November 29, 2005 at ¶ 2: "Faculties are the means by which the bishop of a diocese, or
archbishop, confers permission to a visiting priest who labors in the diocese for the salvation of
souls to hear confessions, say Mass, preach, and administer the sacraments of the Roman
Catholic Church. The granting of faculties is a purely religious function." The process is
apparently begun by an "application for faculties" by the visiting priest to the bishop of the
diocese the priest is visiting. *Id*., ¶ 4.

may judicially notice the promulgation of the Dallas Charter; and I draw the inference that in response to the Charter the New York Archdiocese in 2002 enacted changes in its procedures, one of which O'Connor described in his 2004 memorandum. Specifically, the pre-2002 practice of viewing all ordained priests as having "universal faculties," so that a visiting priest did not have to go "through the Chancery" and generate "all the paperwork" inherent in a vetting by the Archdiocese, was changed to require all visiting assisting priests "to receive Archdiocesan faculties."

Plaintiff also submits an affidavit verified on September 8, 2006 by Fr. Robert M. Hoatson, an ordained Catholic priest, who purports to express an opinion as an expert witness that, *inter alia*, "Cardinal Egan is not being truthful if he claims he knew nothing of the Fr. Kennedy appointment," ¶ 8, and "[u]nder the circumstances of this case, Cardinal Egan is clearly the employer of Fr. Kennedy and responsible for Fr. Kennedy's actions, and especially since some of the acts occurred on and at church property." ¶ 11.[8]

### 4. The Merits of Cardinal Egan's Motion for Reconsideration

Viewing the case upon this expanded record, it is apparent that Cardinal Egan's motion for reconsideration must be granted and summary judgment entered dismissing Plaintiff's complaint against him. That result is mandated by the Second Circuit's opinion in *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d Cir. 2004).

*Ehrens* is instructive because, as in the case at bar, a church member sued ecclesiastical authorities for negligently supervising or retaining a minister who allegedly committed sexual assaults upon the church member (a minor at the time). Specifically, the plaintiff in *Ehrens* alleged

---

[8] Lastly, and by leave of Court, Plaintiff submits papers in sur-reply to the Church Defendants' motion. Those papers do not bear upon Cardinal Egan's present motion for reconsideration of *Bouchard I*'s denial of summary judgment in his favor.

that from 1962 until 1977 Frederick Chapman, an ordained Lutheran minister, served as a pastor for

a Lutheran congregation located in New York.  Defendant The Lutheran Church-Missouri Synod is

the central advisory and organizational body of America's second-largest Lutheran Church.  The

Synod is divided into several geographical Districts, each of which, as the Synod's representative,

performs the functions of the Synod at the local level.  Defendant The Lutheran Church-Missouri

Synod Atlantic District exercises jurisdiction over Lutheran congregations located in the New York

area.

In 1977 Chapman resigned from his New York congregation and moved to Massachusetts.

The Lutheran Atlantic District transferred his name to the New England District's roster of ordained

ministers.  In 1981 Chapman requested and was granted emeritus status.  In 1990 or 1991, Chapman

joined a Lutheran congregation in Massachusetts.  As a retired minister, Chapman sometimes

assisted the regular pastors in their clerical duties.  Plaintiff Ehrens, a member of the same

congregation, met Chapman at the church and alleged that in 1994 and 1995 Chapman sexually

assaulted him, the assaults taking place at Ehrens's and Chapman's respective residences.

Plaintiff Ehrens's complaint against the Lutheran Synod and its Atlantic District (collectively

referred to by the Court of Appeals as "the defendants") alleged that "the defendants are liable for

Chapman's tortious conduct on a theory of negligent retention or supervision."  385 F.3d at 235.

That is the gravamen of Plaintiff Bouchard's complaint against Cardinal Egan in the case at bar.  The

District Court in *Ehrens* granted the defendants' motion for summary judgment.  The Second Circuit

affirmed.

The first lesson *Ehrens* teaches is that "[i]n determining the appropriateness of a grant of

summary judgment, we, like the district court in awarding summary judgment, may rely only on

12

admissible evidence " 385 F.3d at 235. That limitation is mandated by the language of Fed. R. Civ. P. 56(e), which provides explicitly that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Submissions on summary judgment motions are not limited to affidavits. Fed. R. Civ. P. 56(c) provides that the requisite showing may be made by "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ." Fed. R. Civ. P. 56(e) permits "affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." But *Ehrens* makes it clear that a court can consider submissions supporting or opposing summary judgment only if they consist of factual material that would be admissible at a trial.

In the case at bar, Cardinal Egan's affidavit may be considered because it is based upon his personal knowledge. The same is true of Monsignor O'Connor's June 14, 2004 memorandum to the file. Although that memorandum is not sworn to, I may consider its contents because O'Connor's statement is offered by Plaintiff, the opposing party, and is admissible under the exception to the hearsay rule found in Fed. R. Evid. 801(d)(2)(D).

In stark contrast, Fr. Hoatson's affidavit contains nothing that would be admissible at trial. It would appear that Fr. Hoatson never served at the New York Archdiocese, let alone at the times pertinent to the action. Accordingly he has no personal knowledge of the practices and procedures of the Archdiocese in general and Cardinal Egan in particular with respect to the employment and supervision of a visiting priest such as Fr. Kennedy in 2001. Fr. Hoatson's argumentative and conclusory opinions, offered in the guise of a self-proclaimed "expert" and quoted in part *supra*, would not be admissible at trial. Even if the Court were to qualify Fr. Hoatson at trial as an expert

in designated areas – a doubtful proposition – Fed. R. Evid. 702(1) requires that the opinion

testimony of an expert be "based upon sufficient facts or data," a showing Fr. Hoatson cannot make

in connection with the issue in question.  Finally, Hoatson's opinion about what Egan knew, did not

know, or should have known about Kennedy, and his opinion about whether Egan should be

regarded as Kennedy's employer and accordingly legally responsible for Kennedy's conduct, would

not be admissible at trial.  The first opinion impermissibly usurps the power of the jury to find the

facts.  The second opinion impermissibly usurps the power of the Court to instruct the jury on the

law.  *See, e.g., Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,* 14 F. Supp. 2d 391

(S.D.N.Y. 1998) (collecting cases).[9]

As for the merits, in *Ehrens* the Second Circuit held that "[t]o state a claim for negligent

supervision or retention under New York law, in addition to the standard elements of negligence, a

plaintiff must show: (1) that the tortfeasor and the defendant were in an employee-employer

relationship; (2) that the employer knew or should have known of the employee's propensity for the

conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed

on the employer's premises or with the employer's chattels." 385 F.3d at 235 (citations and internal

quotation marks omitted).  The district court found that Ehrens failed to adduce evidence sufficient

to satisfy the second element.  Affirming that conclusion, the Second Circuit stated:

---

[9] Egan's supplemental brief at 2 advises me that Fr. Hoatson "is a plaintiff in a lawsuit in which he is suing Cardinal Egan and the Archdiocese and in which he is represented by Plaintiff's counsel [in the case at bar], Mr. Aretakis."  If this is an invitation to disregard Hoatson's affidavit on the ground of bias, I decline it.  The bias or interest of a witness goes to his credibility, an evaluation traditionally left to the jury.  I conclude that the averments in Hoatson's affidavit would be inadmissible at trial, and consequently cannot be considered on this motion, for the quite different reasons stated in text.

14

> We agree.  In response to Ehrens's first set of interrogatories, the defendants indicated that prior to July 1997, when the New England District received a letter from Ehrens's former counsel, they were unaware that Chapman had ever engaged in, or been accused of engaging in, sexual misconduct.  Ehrens, for his part, failed to counter this assertion with admissible evidence from which a reasonable juror could infer that the defendants, at any time prior to the relevant incident, knew or should have known of Chapman's propensity to assault minors or otherwise to engage in inappropriate sexual conduct.  The district court therefore properly awarded summary judgment to the defendants on Ehrens's negligence claims, all of which he premised on a theory of negligent retention or supervision.

*Id.* (footnote omitted).

With respect to Bouchard's claims that Cardinal Egan negligently supervised or retained Fr. Kennedy as an assisting priest at the parish, there is no discernible difference in the proof and lack of proof on this element in *Ehrens* and in the case at bar.  The affidavits of Cardinal Egan and Monsignor O'Connor, amplified by O'Connor's contemporaneous memorandum prepared before Bouchard commenced this action,  demonstrate that Egan neither knew nor should have known "at any time prior to the relevant incident" of Fr. Kennedy's propensity "to engage in inappropriate sexual conduct" (again quoting *Ehrens*).   These averments of lack of knowledge are indistinguishable from those proffered by the Lutheran hierarchy in *Ehrens;* and, like the plaintiff in *Ehrens*, Bouchard does not suggest the existence of any admissible evidence that would allow a jury to find the existence of such knowledge on Egan's part.[10]

---

[10]  I am mindful of my statement in *Bouchard I* that "[w]here, as here, the probative evidence is almost exclusively in the possession of the moving party, giving the non-moving party a full opportunity to conduct discovery is an exercise in simple fairness."  2006 WL 1375232, at *9.  At the time that opinion was filed, Egan had not submitted his affidavit.  Bouchard has noticed the deposition of Cardinal Egan, who has moved for a protective order vacating the notice.  That motion is pending before Magistrate Judge Pitman.  I raise this subject in the present context in order to observe that the cases, in proper circumstances, sanction the granting of summary judgment even though the moving parties have not been deposed and

It might be argued on Bouchard's behalf that the more stringent procedures with regard to hiring visiting priests that the Archdiocese, presumably at Egan's direction, adopted in 2002 in response to the Dallas Charter would support a jury finding that the less careful procedures in effect pre-Dallas Charter in 2001, when Fr. Kennedy was hired to assist at Our Savior, constituted negligent hiring ascribable to Egan.  But such a theory of negligent hiring is not legally viable in the case at bar.  In *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (N.Y. App. Div. 2d Dep't 1997), the plaintiffs' complaint against the Diocese alleged that they were sexually abused by an ordained priest from Venezuela who was  visiting at a Brooklyn parish.  The Appellate Division affirmed the holding of the trial court that the priest's conduct "did not fall within the scope of his employment and therefore the [Diocese] is not vicariously liable for his conduct under the theory of *respondeat superior*." 229 A.D.2d at 161 (citations omitted).  The court then recited these familiar principles:

> In instances where an employer cannot be held vicariously for its
> employer's torts, the employer can still be held liable under theories
> of negligent hiring, negligent retention, and negligent supervision.
> However, a necessary element of such causes of action is that the
> employer knew or should have known of the employee's propensity
> for the conduct which caused the injury.

subjected to cross-examination.  Thus the Lutheran authorities in *Ehrens* were granted summary judgment on the basis of their sworn answers to interrogatories. *See also Meiri v. Dacon*, 759 F.2d 989, 994 (2d Cir. 1985), a Title VII employment discrimination suit where the defendants successfully moved for summary judgment on the basis of "the affidavits of Claudius Dacon, Adele Stern (Dacon's secretary who was Jewish) and Joseph Schleifer (an Orthodox Jew who also worked for Dacon), as well as documented evidence of Meiri's inappropriate actions."  As noted in text, Rule 56 specifically identifies affidavits as a means by which a motion for summary judgment may be supported.

I also note that, for the reasons stated in text, summary judgment is granted to Cardinal Egan and he disappears as a party in the case.  That is not dispositive of Plaintiff's desire to depose him, since non-party witnesses may be served with notices of deposition.  That matter is before Magistrate Judge Pitman for initial decision; he will make of this Opinion what he will.

*Id*. (citations omitted).  Focusing on the concept of negligent hiring, the *Kenneth R.* court said:

> With respect to negligent hiring, the documentary evidence in the record establishes that the [Diocese] did not and could not have known of Jimenez's propensities when he arrived here from Venezuela with a letter of reference. The plaintiffs allege that the [Diocese] should have initiated some investigations of Jimenez before hiring him to work in a church under its control.  The question of whether there is such a common-law duty is a question of law for the courts.  There is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee.  Since Jimenez came to the [Diocese] with a letter of reference from his Archbishop, which gave the appellant no reason to believe there was any problem, the [Diocese] cannot be charged with negligence for failing to investigate further.

*Id*. at 163 (citations omitted).  While in the case at bar there is no present evidence that Fr. Kennedy presented a letter of reference from his bishop when he was hired at the Church of Our Savior, that is not sufficient to distinguish the Appellate Division's holding or rationale in *Kenneth R.*  It is undisputed that Kennedy was an ordained Roman Catholic priest.  "Ordination to the priesthood confers a religious, not legal status," *Kenneth R.*  at 162, upon which the parish church of Our Savior was entitled to rely; as for Egan, his Archdiocese was not responsible for Kennedy's ordained status, and in the absence of any evidence that Egan knew or could have known of Kennedy's propensities, he cannot be liable in law for a failure "to screen or determine [Kennedy's] fitness for the priesthood," *id*. at 163, or for his hiring as a parish assistant.[11]

_____

[11]  In *Kenneth R.* the Appellate Division dismissed the plaintiffs' claim against the Diocese for negligent hiring of the visiting priest but allowed the claims for negligent retention and negligent supervision to go forward because the plaintiffs asserted in their bill of particulars that "statements made by the infant plaintiffs to priests at St. Leo's Church and Our Lady of Sorrows Church and [statements] from Jimenez himself" arguably gave the Diocese "actual or constructive knowledge of the codefendant Jimenez's propensity to sexually abuse children." 229 A.D.2d at 164.  The Plaintiff at bar does not point to any comparable evidence.

When the New York court's decision in *Kenneth R.* is read together with the Second Circuit's decision in *Ehrens*, it is apparent that Bouchard has no viable claim against Cardinal Egan for negligent hiring, supervision, or retention of Fr. Kennedy.  Summary judgment will therefore be entered dismissing the Plaintiff's complaint as against Egan.[12]

### III. CONCLUSION

For the foregoing reasons, the Court makes the following Order:

1.   The motion of Defendants The New York Archdiocese, Church of Our Savior, and Edward Cardinal Egan for summary judgment on the basis of the statute of limitations is denied as

---

[12]   In *Ehrens* the Second Circuit also held that because Ehrens acknowledged that "the incidents of sexual assault about which he complains did not occur on church property but instead were perpetrated at his home and Chapman's home," he could not satisfy "the third element of a negligent supervision cause of action – the requirement that the tort must have been committed on the employer's premises or with the employer's chattels."  385 F.3d at 236.  Lastly, the Second Circuit declined to reach Ehrens's contention that the district court erred "in ruling that the First Amendment precludes a finding that church authorities negligently retained or supervised a clergyman."  *Id*.  Cardinal Egan asserts the same two contentions as alternative grounds for summary judgment in his favor.  I do not accept either one.  The priestly misconduct in *Ehrens* apparently occurred entirely in private homes.  In contrast, Bouchard's deposition describes three meetings with Fr. Kennedy, the first two occurring within the walls of the Church of Our Savior.  While Kennedy's most inappropriate behavior took place in Bouchard's apartment, his blandishments and promises during the preceding two meetings in the church could reasonably be regarded by a jury as preparatory for and consequently an integral part of the conduct consummated during the third meeting in the apartment.  That is so, notwithstanding Bouchard's deposition testimony that she did not feel Kennedy was doing anything "wrong" during the first two meetings.  The jury could connect the dots and conclude that what Kennedy was doing in the church was very wrong.  As for the Church Defendants' First Amendment contention, I decline to reach it for the same reasons the Second Circuit declined to do so in *Ehrens,* although I note that while leaving that question open, the Court of Appeals pointedly referred to its prior holding in *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999), that the Free Exercise Clause "does not prevent courts from deciding secular disputes involving religious institutions when and for the reason that they require reference to religious matters."

to Plaintiff's claim for negligent hiring, supervision, and retention of Defendant Fr. Kennedy. That motion is granted as to Plaintiff's claim for the intentional infliction of emotional distress.

2. The motion of Defendant Edward Cardinal Egan for reconsideration or reargument of this Court's opinion dated May 18, 2006 is granted, and his accompanying motion for summary judgment dismissing the Plaintiff's complaint as to him is also granted. The Clerk of the Court is directed to dismiss the Plaintiff's complaint against Egan with prejudice and without costs.

It is SO ORDERED.

Dated: New York, New York
October 24, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE