UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGIE BOUCHARD,

                Plaintiff,

-against-

NEW YORK ARCHDIOCESE, CARDINAL JOHN EGAN, CHURCH OF OUR SAVIOUR, FR. KENNEDY, FR. "JOHN DOE," AND "JOHN DOE" RELIGIOUS ORDER,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

04 Civ. 9978 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Angie Bouchard brought this action on August 31, 2004, in New York State court, alleging numerous common law claims relating to sexual abuse she suffered at the hands of Father Fernando Kennedy.[1] On December 17, 2004, Defendants Archdiocese of New York (the "Archdiocese"), Cardinal John Egan, and the Church of Our Savior removed this action to federal court based on diversity jurisdiction under 28 U.S.C. § 1332.[2] (Docket No. 1)

        As a result of Judge Haight's May 18, 2006 and October 24, 2006 orders concerning Defendants' previous motion to dismiss and motion for summary judgment (Docket Nos. 28 & 63),[3] the only claims remaining in this case are for negligence and

---

[1] Although Plaintiff is currently proceeding pro se, she was represented by John A. Aretakis, Esq. from the inception of her action through early 2009, when Aretakis was suspended from practicing law. See Pltf. 2009 Aff. at 1; In re Aretakis, 57 A.D.3d 1160 (3d Dep't 2008), lv. denied, 11 N.Y.3d 919 (2009).

[2] None of the remaining defendants in this action have been served.

[3] This action was reassigned to this Court on October 8, 2008. (Docket No. 86)

negligent hiring, supervision, and retention against the Archdiocese and the Church of Our Saviour ("Defendants").[4]  (Am. Cmplt. ¶¶ 27-34, 71-78)  Defendants have moved for summary judgment on those remaining claims.  (Docket No. 102)  Because Plaintiff has offered no evidence that Defendants knew or should have known of Father Kennedy's alleged propensity to commit sexual abuse, Plaintiff's negligence claims fail as a matter of law, and Defendants' motion for summary judgment must be granted.

## BACKGROUND

### A.   Factual History

In the summer of 2001, Father Fernando Kennedy, a Roman Catholic priest from Sri Lanka, served as a visiting priest at the Church of Our Saviour in Manhattan for two to three months.  (Defs. Rule 56.1 Stat. ¶¶ 1-2; O'Connor Dep. at 27-28)[5]  The Church of Our Saviour is located within the Archdiocese of New York.  (Defs.

---

[4] Judge Haight dismissed all claims against Cardinal Egan on October 24, 2006.  (Docket No. 63)

[5] To the extent that this Court relies on facts drawn from Defendants' Rule 56.1 statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with Defendants' characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Because Plaintiff has provided very few citations to admissible evidence in her Rule 56.1 Statement and is proceeding pro se, the Court has conducted an independent review of the evidence in the record, and cites to this evidence where appropriate.  The Court is entitled to rely on "pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits" under Fed. R. Civ. P. 56.  The Court has considered only evidence that would be admissible at trial, however.  Feingold v. New York, 366 F.3d 138, 155 n.17 (2d Cir. 2004).

2

Rule 56.1 Stat. ¶ 2) The Church of Our Saviour was without a pastor during the summer of 2001 – when Father Kennedy served as a visiting priest – because the previous pastor had died and had not yet been replaced. (O'Connor Dep. at 30)

During that summer, Father Kennedy "performed certain duties of a priest at the Church of Our Savior [sic], . . . and [] was paid by the church to perform said duties. However, Fr. Kennedy was never trained or supervised by any priest at the Church of Our Saviour or the Archdiocese of New York." (Pltf. Rule 56.1 Stat. ¶ 2) In 2001, "all priests had universal faculties to celebrate Mass and hear Confessions, so it was not unusual . . . for pastors to have a priest help out without getting all the paperwork."[6] (Alonso Decl., Ex. F (O'Connor 2004 Memorandum)[7]; see also Bouchard v. New York Archdiocese, No. 04 Civ. 9978 (CHS), 2006 WL 3025883, at *4 (S.D.N.Y. Oct. 24, 2006) ("Bouchard II"). Church pastors were permitted to invite "visiting priest[s] for the summer to help out," without obtaining prior approval from the Archdiocese or church administration. (O'Connor Dep. at 17)

During the summer of 2001, when Plaintiff was twenty-four years old, she met Father Kennedy while attending mass at the Church of Our Saviour. (Pltf. Dep. at 148; Defs. Rule 56.1 Stat. ¶ 3) Father Kennedy asked Plaintiff whether she had ever been sexually abused. After Plaintiff told him that she had been abused, Kennedy "started

---

[6] On June 14, 2002, a conference of American Catholic bishops adopted the "Charter for the Protection of Young People," which requires all "'visiting assisting priests' to receive Archdiocesan faculties." See Bouchard II, 2006 WL 3025883, at *5. The term "faculties" refers to "'the means by which the bishop of a diocese, or archbishop, confers permission to a visiting priest who labors in the diocese for the salvation of souls to hear confessions, say Mass, preach, and administer the sacraments of the Roman Catholic Church.'" Id. at *5 n.7 (quoting O'Connor Aff. ¶ 2).

[7] The O'Connor memorandum is offered by Plaintiff, and thus may be considered as an admission under Fed. R. Evid. 801(d)(2)(D). See Bouchard II, 2006 WL 3025883, at *4.

talking about how he had helped other women around the world with his . . . method of helping women with abuse – with getting better from abuse." (Pltf. Dep. at 151-52, 154) Kennedy then suggested that they "make an appointment and we can talk about it or I can show you." (Id. at 155) Near the end of July, Plaintiff met with Kennedy in private at the Church sacristy. (Id. at 160-61, 164) After questioning her about the abuse she had suffered, Kennedy told Plaintiff to take a cloth and "wipe the area in which [she] was touched or abused [and] imagine this person going up in flames or burning away in flames and disappearing." (Id. at 165) Plaintiff followed Kennedy's instructions and proceeded to "wipe" herself in this way, over her clothes, describing "out loud" what she was imagining. (Id. at 165, 169) At the end of this meeting, Plaintiff agreed to meet with Kennedy a second time "to continue the method." (Id. at 213)

During the second private session, also conducted in the Church sacristy, Kennedy instructed Plaintiff to wipe herself in the same way and to again imagine her abusers "going up in flames." (Id. at 236) It is not clear whether Kennedy touched Plaintiff during these meetings. (See Pltf. Rule 56.1 Stat. ¶ 4; Pltf. 2009 Aff. ¶ 13; but see Pltf. Dep. at 161) At the time, Plaintiff did not think that anything that had transpired at these meetings was wrong. She "felt [Father Kennedy] was trying to help and [Plaintiff] had never had help at all really with [her] abuse." (Id. at 215) Plaintiff did not believe that the sessions were effective, however, and told Kennedy "[t]his is not working" and that she was "uncomfortable." (Id. at 236) Kennedy responded that "the reason why this isn't working is because we're not in the right setting," and "for this to really be working for you, we need to have a bed and we need to have a room, a private room with a bed." (Id. at 68)

4

The third and final encounter between Plaintiff and Kennedy took place at Plaintiff's apartment in Queens in early September 2001.  Kennedy instructed Plaintiff to lie down and repeat the same acts of wiping her body with a cloth and imagining her abusers in flames.  (Id. at 70)  Kennedy then told Plaintiff, however, that he needed to do "one last thing" and "time how long it takes for [her] to orgasm, and if it's within a certain amount of time, then my method has worked."  (Id. at 72-73)  Father Kennedy then used his hand to bring Plaintiff to orgasm.  (Id.)  Afterwards, Kennedy told Plaintiff to "get up" and "brought [her] in front of a mirror and started touching [her] breasts," telling her "I have to do this because . . . if I touch them, I know by their . . . look, that you're [] better now."  (Id. 73-74)  As he was leaving, Kennedy told Plaintiff he would be leaving the country soon and would not see her again.  (Id. at 74)

Plaintiff did not disclose this sexual abuse until she began meeting with therapist Delores McCullough near the end of 2002 or early 2003.  (Pltf. Dep. at 264-68, 271-72)  On April 27, 2004, McCullough informed Monsignor Desmond O'Connor, the Archdiocese's Director of Priest Personnel and victims' assistance coordinator, of Plaintiff's allegations.  (Defs. Rule 56.1 Stat. ¶ 5; O'Connor Dep. at 8, 22)  This was the first notice to Defendants of Plaintiff's allegations concerning Father Kennedy.  (Defs. Rule 56.1 Stat. ¶ 6; O'Connor Dep. at 22)  Defendants had likewise not previously been aware of any other claims of sexual abuse made against Father Kennedy.  (Defs. Rule 56.1 Stat. ¶ 6; O'Connor Dep. at 54)

After learning of Plaintiff's allegations, O'Connor identified Plaintiff's alleged abuser as Father Kennedy – Plaintiff could not recall his name – and met with Plaintiff to discuss the abuse.  (Alonso Decl., Ex. F; O'Connor Dep. at 23-25)  On June

5

21, 2004, O'Connor sent a letter to the bishop of Kennedy's home diocese in Sri Lanka notifying him of Plaintiff's allegations.[8]  (Alonso Decl., Ex. A)  The Church also paid for certain therapy Plaintiff received, but otherwise took no action concerning Plaintiff's allegations.  (Id. Ex. F; Pltf. 2009 Aff. ¶ 10)

### B.  Procedural History

Plaintiff filed this action on August 31, 2004, shortly after her meeting with O'Connor.  On May 18, 2006, Judge Haight dismissed Plaintiff's battery, negligent infliction of emotional distress, and breach of fiduciary duty claims.  Bouchard v. New York Archdiocese, No. 04 Civ. 9978 (CHS), 2006 WL 1375232 (S.D.N.Y. May 18, 2006) ("Bouchard I").  Judge Haight denied Defendants' motion for summary judgment on Plaintiff's remaining claims, however, stating that "[w]here factual issues are decisive, it is generally considered preferable for the parties to complete discovery. . . . Accordingly the present motion of the Archdiocese and Egan for summary judgment is denied, without prejudice to those Defendants' renewal of their motion after completion of discovery."  Bouchard I, 2006 WL 1375232, at *9.

On October 24, 2006, Judge Haight ruled that Plaintiff's claim for intentional infliction of emotional distress was barred by the applicable one-year statute of limitations, and dismissed all claims against Defendant Egan.  Bouchard II, 2006 WL 3025883.  Judge Haight granted summary judgment to Egan because Plaintiff had

---

[8] Defendants place heavy reliance (see, e.g., Def. Br. 2, 9, 12, 15; Def. Rply. Br. 2) on the Sri Lankan bishop's return letter, in which he assures O'Connor that O'Connor's letter "was the fist inkling we had that this priest had had a problem of this nature." (Alonso Decl., Ex. A)  The bishop's letter is obvious hearsay – it is an out of court statement being offered for its truth.  Fed. R. Evid. 801(c).  It was improperly laid before the Court in connection with this motion, particularly given that the plaintiff is proceeding pro se.

6

produced no evidence suggesting that he had knowledge of Father Kennedy's alleged propensity to commit sexual abuse. Bouchard II, 2006 WL 3025883, at *8. The parties then completed discovery on Plaintiff's remaining claims for negligence and negligent hiring, retention and supervision.

## DISCUSSION

Defendants argue that they are entitled to summary judgment because (1) there is no evidence that they were aware of Father Kennedy's alleged propensity to commit sexual abuse; (2) Plaintiff consented to Father Kennedy's actions; and (3) the alleged sexual abuse did not occur on Church property. (Defs. Br. at 10) This Court reaches only the first issue: whether the Defendants knew or should have known about Father Kennedy's alleged propensity to commit sexual abuse. Because Plaintiff, despite full discovery, has not offered any evidence suggesting such knowledge, Defendants' motion for summary judgment must be granted.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Whether facts are material is a determination made by looking to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Donahue v. Artisan, No. 00 Civ. 8326 (JGK), 2002 WL 523407, at *1 (S.D.N.Y April 8, 2002) (explaining that party

7

resisting summary judgment must "come forward with specific facts to show there is a factual question that must be resolved at trial"). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (citations and internal quotation marks omitted).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

While the submissions of a pro se plaintiff should be liberally construed, Nealy v. U.S. Surgical Corp., 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008), a pro se plaintiff is not excused from meeting the evidentiary standards required to defeat a motion for summary judgment. See Hare v. Hoveround Corp., No. 06 Civ. 1081 (NAM)(GHL), 2009 WL 3086404, *2 (N.D.N.Y Sept. 23, 2009) (citing Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)); Dipilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 343 (S.D.N.Y. 2009) (quoting Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (a "pro se party's 'bald assertion,' completely unsupported by evidence,

is not sufficient to overcome a motion for summary judgment")(internal citations omitted)).

### B. Plaintiff's Negligence Claims

"In instances where[,as here,] an employer cannot be held vicariously liable for its employee's torts [because they occur outside the scope of his employment], the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision."[9] Kenneth R. v. Roman Catholic Diocese of Brooklyn, 229 A.D.2d 159, 161 (2d Dep't 1997). "A claim for negligent supervision or retention arises when an employer places an employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." Vione v. Tewell, 820 N.Y.S.2d 682, 687 (N.Y. Sup. Ct. 2006).  Under New York law, a claim for negligent hiring, supervision or retention, "in addition to the standard elements of negligence," requires "a plaintiff [to] show:  (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and, (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) quoting Kenneth R., 229 A.D.2d at 161 (internal citations omitted).

---

[9] Judge Haight previously ruled that "[t]o the extent that Plaintiff is seeking to hold the Church Defendants vicariously liable for Kennedy's [torts] such a claim cannot stand, because the wrongful conduct on Kennedy's part necessary to support the claim would be outside the scope of his employment as a priest and unrelated to the furtherance of the Church Defendants' business." Bouchard I, 2006 WL 1375232, at *5

"A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee.'" Richardson v. City of New York, No. 04 Civ. 05314 (THK), 2006 WL 3771115, at *13 (S.D.N.Y. Dec. 21, 2006) (quoting Adorno v. Correctional Services Corp., 312 F. Supp. 2d 505, 518 (S.D.N.Y. 2004)); see also Wilson v. Diocese of N.Y. of the Episcopal Church, No. 96 Civ. 2400 (JGK), 1998 WL 82921, at **3-4 (S.D.N.Y. Feb. 26, 1998)).

### III. PLAINTIFF HAS OFFERED NO EVIDENCE THAT DEFENDANTS WERE ON NOTICE OF FATHER KENNEDY'S ALLEGED PROPENSITY TO COMMIT SEXUAL ABUSE

Defendants argue that their motion for summary judgment must be granted because there is no evidence that they were on notice of Father Kennedy's alleged propensity to commit sexual abuse. (Defs. Br. at 11) Plaintiff cites no such evidence in rebuttal, but merely relies on conclusory statements and speculation found in her deposition testimony and affidavits.

Plaintiff's only basis for alleging that Defendants knew or should have known of Father Kennedy's propensity for sexual abuse is his statement to her that he had "helped other women with these problems that have had a history of sexual abuse. And I helped them get better. . . ." (Pltf. Dep. at 255-56, 362) Plaintiff interpreted Kennedy's statement to mean that "he [had] asked [other women] to do the same thing that he [had] asked" her to do on three occasions. (Id. at 256-57; see also Pltf. 2009 Aff. ¶ 8) Assuming arguendo that Kennedy's statements are admissible against Defendants as an admission, they do nothing to suggest that Defendants were aware of Kennedy's prior conduct, presumably committed in Sri Lanka. Plaintiff's assertion that Monsignor

10

O'Connor admitted to her that the Archdiocese has "had trouble keeping track of these visiting priests" (Pltf. Dep. at 465; Opp. at 11) likewise has no bearing on whether the Archdiocese or the Church of Our Saviour was on notice that Father Kennedy had a propensity to commit sexual abuse. Plaintiff conceded at her deposition that – other than Father Kennedy's statement to her – she had no information "about any record or past that Father Kennedy had with the church." (Pltf. Dep. at 262, 287)

Plaintiff misunderstands both her burden at summary judgment and the elements of her remaining causes of action. She argues that "[n]ot one word in the Defendants' Brief states they did any prior investigation of FR. KENNEDY, nor do the Defendants state that they trained and supervised him and that he was instructed to not touch females." (Opp. at 11) Defendants, however, had no duty to investigate Kennedy, or to warn him not to sexually abuse parishioners, when they had no reason to believe that he would engage in such misconduct. Under New York law, "[t]here is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee." Kenneth R., 229 A.D.2d at 163; accord Golodner v. Quessant Inc., No. 05 Civ. 7895 (RLE), 2007 WL 2844944, at *6 (S.D.N.Y. Sept. 27, 2007); see also Sandra M. v. St. Luke's Roosevelt Hosp. Ctr., 33 A.D.3d 875, 879 (2d Dep't 2006) (quoting Kenneth R.); Koran v. New York City Bd. Of Educ., 256 A.D.2d 189, 191 (1st Dep't 1998) (citing Curtis by Curtis v. County of Oneida, 248 A.D.2d 999, 999 (4th Dep't 1998); Stevens v. Lankard, 31 A.D.2d 602, 603 (2nd Dep't 1968), aff'd. 25 N.Y.2d 640 (1969)).

11

While Plaintiff has offered no facts suggesting that Defendants were on notice of Kennedy's propensity to commit sexual abuse,[10] Defendants have offered admissible evidence that they had no such knowledge. Monsignor O'Connor testified that in 2001 "summer priest[s]" did not require appointment by the Archdioceses director of priest personnel, and could be invited by an individual pastor to "help out." (O'Connor Dep. at 17, 21) Neither Monsignor O'Connor nor the office of priest personnel had any knowledge of Father Kennedy's existence until O'Connor investigated Plaintiff's allegations in 2004. (Id. at 23, 37) Cardinal Egan, head of the Archdiocese at all relevant times, submitted an affidavit stating that "[w]hen priests from other dioceses and from religious orders visit parishes within the Archdiocese, there is virtually never a reason for them to be brought to my attention." (Egan Aff. ¶ 4 (Alonso Decl., Ex. H) Egan "categorically stated that [he] had never met, sanctioned or authorized Father Kennedy, nor did [he] have anything to do with his alleged presence or purported service

---

[10] The testimony of Father Thomas Doyle and Father Robert Hoatson – alleged experts on clergy sexual abuse – does not supply the necessary proof. As Judge Haight noted in addressing the admissibility of Father Hoatson's affidavit in Bouchard II, "he has no personal knowledge of the practices and procedures of the Archdiocese in general and Cardinal Egan in particular with respect to the employment and supervision of a visiting priest such as F. Kennedy in 2001. . . . [Any] opinion [of Hoatson's] about what [Defendants] knew, did not know, or should have known about Kennedy. . . . impermissibly usurps the power of the jury to find the facts" and would be inadmissible at trial. Bouchard II, 2006 WL 3025883, at *7. Hoatson conceded at his deposition that he has no personal knowledge of Defendants' knowledge concerning Kennedy's past or any other information pertinent to this motion. (See Hoatson 1/30/2009 Dep. at 97-99) Accordingly, Hoatson's conjecture as to what Defendants knew or should have known is entitled to no weight.

Similarly, Thomas Doyle admits that he was not "given any information that led [him] to conclude that an employee of the Church of our Saviour had actual knowledge, prior to September 11, 2001, that Father Kennedy had a propensity to engage in sexual abuse," or that "an employee or representative to the Archdiocese of New York" had such knowledge. (Doyle Dep. at 62-63)

12

in the parish. Until Ms. Bouchard complained to the Archdiocese in 2004, [Egan] had never even heard of Father Kennedy." (Id. ¶ 5)

This case is governed by Ehrens v. Lutheran Church, 385 F.3d 232 (2d Cir. 2004). In Ehrens, a retired minister, Chapman, joined a Lutheran congregation in Massachusetts and assisted the pastors with their clerical duties. Ehrens, 385 F.3d at 234. Plaintiff met Chapman through his involvement with the congregation and alleged that Chapman had sexually assaulted him. Id. The complaint in Ehrens alleged that the president of the Church's Atlantic District was aware that Chapman had been forced to resign from another church because of "inappropriate behavior" toward female church members. Ehrens' complaint pleaded claims of negligence and negligent infliction of emotional distress – "premised on a theory of negligent retention or supervision" – against the Lutheran Synod and its Atlantic District. Id. at 234-35.

The district court granted summary judgment to the defendants, finding that the plaintiff had failed to adduce sufficient evidence demonstrating that the defendants had notice of Chapman's alleged proclivities to commit sexual assault. Ehrens v. Lutheran Church-Missouri Synod, 269 F. Supp. 2d 328, 333-34 (S.D.N.Y. 2003). The Second Circuit affirmed, noting that while the defendants had offered evidence that they were unaware of Chapman's prior sexual misconduct, the plaintiff had failed to counter "with admissible evidence from which a reasonable juror could infer that the defendants, at any time prior to the relevant incident, knew or should have known of Chapman's propensity . . . to engage in inappropriate sexual conduct." Ehrens, 385 F.3d at 235.

With discovery in this case now complete, it is clear that O'Connor and Egan's averments of a lack of knowledge concerning Father Kennedy's alleged propensity to commit sexual abuse are virtually the only relevant evidence on the issue of Defendants' knowledge. Because Plaintiff has offered no evidence that creates a material issue of fact as to Defendants' knowledge, the motion for summary judgment must be granted.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to terminate the motion (Docket No. 102) and to close this case. Any other pending motions are moot.

Dated: New York, New York        SO ORDERED.
       March 24, 2010

*Paul G. Gardephe*
Paul G. Gardephe
United States District Judge